The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. All right. Good morning. We're ready to hear argument in our next case. Brown and Attorney Grinrod, you can start. Thank you, Your Honor. May it please the Court, Andrew Grinrod, on behalf of Eric Brian Brown. The order authorizing forcible medication under cell should be vacated for four independent reasons. One, Eric Brown's single drug regimen already makes him sleep 16 hours a day, and Dr. Corvin testified unrebutted that adding Olanzapine is likely to worsen that sedation. So it was clearly erroneous to find that dramatic sedation under this plan is substantially unlikely. Number two, how likely is it that this regimen will actually restore Mr. Brown? Dr. Grady refused to say, that's the government's expert, and no one has studied the use of multiple antipsychotics for competency restoration. So this record cannot support a finding by clear and convincing evidence that the plan is substantially likely to restore Mr. Brown. Number three, the last time Mr. Brown took Olanzapine, his liver enzyme spiked, which caused his doctors to stop that medication with instructions not to restart it. No one has testified that those doctors were wrong, and antipsychotic polypharmacy in this context goes against current medical guidelines anyway. Thus, restarting Mr. Brown on Olanzapine is not clearly and convincingly in his best medical interest. And number four, as of last week, BOP doctors are treating Mr. Brown under Harper with the same drug regimen that was ordered under cell. So as the Tenth Circuit just recently explained in Osborne, courts should vacate a cell order  Judge Staccaratos. Right. Yeah. So I actually wanted to start there with your fourth point. Is your fourth point actually your first choice that we should vacate the cell order given what's going on now that he's being given the drug regimen that the government wants in the first place? I guess they found a different way to do it.  I think either of these four ways this court's opinion would end with the cell order is vacated. And so we don't have a preference as to which option the court takes. I do think that vacating under the reasoning in Osborne is certainly supported by the case law. I think it makes rational sense. And we would support the court deciding on that ground. Yes, Judge Richardson. Can you talk to me for a second about why, I get that Osborne says, but why we would vacate as opposed to remand for consideration of this new information? Vacating suggests that the district has to start over where what it seems like this new information ought to be considered. And I fully agree with you on that point. And we'll know more in a month than we know today. And obviously, we're not in the business of analyzing that as an initial matter. But why would we vacate in remand as opposed to simply remand, allow the district court to consider whatever information or evidence is developed, and modify or not that information? That seems like what we're really asking the district court to do here, no? Well, Your Honor, I think the court could consider the information if the court remanded instead of vacating. But I think the important difference is if the BOP had been treating Mr. Brown with this drug regimen under Harper, there never would have been a cell hearing. And there may never be the need for another cell order as long as his treatment remains authorized under Harper. So you never reach a Harper. So help me understand that. Because Harper is only about a detainee, right? Not about getting somebody competent for trial. So help me understand, if we vacated this order, under what basis, what legal basis would your client be detained? Because Harper itself is not an authorization for detention. You'd have to look to 4241. If we vacate the order, I don't see the basis for your client being detained. And hence, I think the Harper treatment, we would in essence be doing away with the Harper treatment as well, because he wouldn't be detained anymore, would he? Well, there's still a pending indictment against him, and he did not get bond under the Bail Reform Act. So he would remain in custody during the pendency of the case. Then at some point, there would be a question under Jackson whether there was still a reasonable probability that he would be restored at any point in the future. But I think that would be... Is that right under 4241? It seems like to me the court made a 4241 finding, detained him as a result. That expired in November of 2019. In September of 2019, the government sought a cell order. That delayed it under 4241. But if we vacate the cell order, then it seems like to me you would show up the very next day to BOP and say, let my guy out of jail, because there's no legal authority for holding him. He's being held without legal authority. So I think what your Honor is getting at is two separate questions. One is the authority for him to be in the Attorney General's custody for purposes of evaluation and competency restoration. And then there's a separate question of whether he would just be still in federal pretrial custody. So I think what your Honor is suggesting is correct. If there is not under 4241 a reasonable probability that he will be restored in a reasonable period of time, that's what operationalizes Jackson's standard that prevents people from just being held indeterminately forever when there's no prospect of restoration. That the district court would have to make a finding under a separate inquiry that doesn't involve the cell standard. There's a whole separate Jackson question there. And that it may be that the court has to make a determination as to whether there is a reasonable probability that he will be restored in a period of time for which he's committed to the custody of the Attorney General under the competency statute. But even if we prevailed on that, then there would still be, he would still remain in pretrial custody or the government would have to initiate civil commitment proceedings. But that's only after the district court finds in the first instance that there's no longer a reasonable probability that he will be restored in a reasonable period of time in accordance with Jackson and the statutes that implement those due process concerns. So those are all separate. I don't want to belabor this. Let me just ask one separate way. If we vacate, what I hear you saying is if we vacate as opposed to just remand, if we vacate, then the district court has to start over and make the 4241, have a 4241 hearing to determine whether he can be detained to then have a cell hearing in the future. Literally, it means just starting over as opposed to remanding, which would allow him to take this information into account without starting the entire process over. So Your Honor, I would agree that any cell aspect would have to be restarted over if the court vacated. But I still think Your Honor's question is conflating what I think are two separate inquiries, which is one, whether there is authority for him to be held in the custody of the Attorney General under the competency statutes, and a separate question of whether under the cell regime, which is case law driven, there's a basis to initiate forcible medication for the sole purpose of restoration. But if the court were to vacate, the district court would make a determination as to whether he's properly in custody of the Attorney General. And if he is, then the BOP administrative order that authorizes treatment under Harper would be the basis under which he's receiving forcible medication. And then at that point, the district court could determine... Yes, Your Honor. And if we don't vacate the cell order, don't we in essence give the government what they were looking for anyway? They just did it in a roundabout way and got their cell order in place and time to test their, what I think is a theory, as to whether he can be restored? I think that's right, Your Honor. And Osborne pointed out that one problem, if you were just to dismiss the appeal or just remand for further proceedings, there would still be a valid cell order in effect and the government could effectively keep that order in their back pocket. And if in a week, this same treatment is no longer properly justified under Harper because Mr. Brown is no longer a danger to himself or others or gravely disabled, then they could just fall back on this existing cell order. And so that's a reason to vacate also. But the current cell order is stayed by the district court. And so if we remanded, it would remain stayed until the court could consider this new information, no? I mean, they couldn't start using the cell order if we remanded. They would have to go to the district court and have the district court lift the stay before they began doing so. Your Honor, well, I think as long as the court was clear about the language in the remand that the stay should remain in order, if the court goes that route, we would ask that that be clear. I think it's a little ambiguous whether the stay would automatically remain in place, but certainly the court could address that with specific language. The broader problem, though, is that if you just remand, the cell itself says you don't turn to cell, you don't turn to forcible medication explicitly and exclusively for the purpose of restoration when the same medication is authorized under Harper. And so the remand would be an awkward procedural position because the district court would be in a situation where at least as of today, Mr. Brown is receiving the very medication that the government wants to do under cell under Harper. And if you just go back to first principles, if that were the case before the government ever filed its cell motion, they never would have filed their cell motion. Indeed, that was the situation we were in for about 18 months when he was receiving Haloperidol under Harper. The government doctors were saying this is likely... Yes, Your Honor. Yeah, for 18 months he was receiving that and he was not restored to competency, correct? That's correct, Your Honor. I think, Your Honor, another reason to vacate would be that the other error that underlies the cell order is profound and diffuse. And so starting over may just be the best way to start with a clean slate. It's also entirely plausible that whatever the government learns from this, whatever the doctors learn from this Harper treatment will cause them to change the recommended treatment. So a remand, it assumes that the same treatment will be what is recommended after it is stopped under Harper. No, it doesn't seem like it assumes that at all. It seems like to me what it assumes is that the district court ought to be the one doing this. Right? And that if it turns out, for example, that under Harper his liver enzymes don't change as this has happened and so that's good, well, the argument about the liver enzyme sort of goes away. Right? And so the court can address that. In contrast, if his liver does this or he starts sleeping 24 hours a day, or I guess that's probably unlikely, but 22 hours a day, then the court would take that into account. I mean, it seems to me the remand is simply to say, listen, there's been a new development district court. You should address this as an initial matter. And if the district court addresses in a manner that you're not satisfied with, then you can come back and address it with us at that point rather than us making a determination about the value of this. If that's the nature of the remand, then I don't know that there's a big functional difference between the two. But I think it's important to recognize, Your Honor, that remanding to go back for further proceedings on a cell order that itself would not have been issued if the same treatment were going on under Harper. I think there's some issues there, right? I mean, imagine a world in which... That may not be true. I mean, I don't know this, right? So I'm not a doctor by the remotest sense of the word, right? So you might imagine that this second drug, the olanzapine, that is only used for a period of time under Harper, right? That it is used for a month. It solves the Harper problem, and they don't maintain it as a maintenance drug. And so that would be useful information, but that doesn't actually restore him to competency because they've stopped using it for the Harper purpose. They would need to reinstitute it for the cell purpose. And so without knowing the manner in which the olanzapine is being used, and whether it will be discontinued once he is stabilized, or whether it will be used as a maintenance drug, we have no way of knowing whether the Harper issue is going to solve the cell issue. The district court has to make that finding. Your Honor, if I may just briefly respond, and then I see my time will be just reserved from there for rebuttal. But, Your Honor, I think the problem is as long as he's on the Harper medication, there would be no basis for issuing a cell order. And so if and when he's no longer on that regime, or if and when the doctors say, in fact, what we're doing under Harper still isn't enough, we need more authority under cell, then at that point the government could file a cell motion and we could litigate the point at that juncture. And I'll reserve the remaining time for rebuttal, Your Honors. Did you have a follow-up question, Judge Richardson? I didn't. Thank you. All right. Thank you. All right. We'll hear from Ms. Gant. May it please the Court. The opinion below is thorough and careful. It rigorously engages with the opinions of both the experts who testified at the lengthy hearing over which the district court judge presided. The district court applied the governing legal standards to approve a treatment plan that is closely tailored to this defendant's individual characteristics and medical history. How is it closely tailored to this defendant? It is closely tailored to this defendant, Your Honor, for several reasons. One, it selects two drugs, Halodol and Olanzapine, both of which this defendant is known to have responded to favorably in the past. Well, he didn't respond so favorably to that second one at Walter Reed. They took him off of it because of the rise in his liver enzymes. Yes, Your Honor. I was focusing primarily on his competency, on its impact on his mental health, which is not disputed. But as to the liver enzymes, it is true that the record reflects that one doctor at Walter Reed thought that it was the cause of elevated liver enzymes, but both experts, including Dr. Corbin, opined, agreed that it was unclear, which... Unclear based on what? I mean, I've read the medical records and it couldn't be more clear that the doctors at Walter Reed who actually had seen him as a patient and reviewed the lab results thought that Olanzapine was the cause of his increased liver enzymes and took him off of it and said not to reinstitute it. So what did the two government experts base this on? I believe it was just one doctor, but both Dr. Corbin at Walter Reed, but both Dr. Corbin and Dr. Grady agreed that other staff members there were unclear as to which drug caused it and that there was ambiguity. Other staff members where? At the Naval Hospital, Your Honor. And the ambiguity was based on what in the records? Because he was also on another antipsychotic at that time that is much more known for causing elevated liver enzymes. So where in the medical records are there other... What did you... Who did you say there were? Medical workers that said that this was unclear? I believe the only medical records that are in this record is Dr. Grady's summary of them, but both experts for the government and the defense testified that they had reviewed the medical records and that there was ambiguity as to which drug caused it, given that the other one that he was on is much more likely to cause liver enzymes. And the district court also noted an apparent lack of careful monitoring while this defendant was at the Naval Hospital and contrasted that with the plan that Dr. Grady had put forth to carefully monitor this defendant. What did they base the lack of careful monitoring on? The alleged lack of careful monitoring, what was that based on? I believe it was on the fact that they increased so quickly or increased without reducing the medications first. So the fact that they noticed it and took him off of it relatively quickly is somehow indicative of a lack of monitoring as opposed to a careful monitoring because they noticed it so quickly? I believe what the district court was relying on was that Dr. Grady would take very frequent blood testing that would allow to control the liver enzymes and Dr. Corvin agreed that this monitoring was adequate and would... Yeah, no, I agree with you that Dr. Grady, there is monitoring in place in the proposed cell order. I was just trying to understand why and on what basis the government is now discounting the government doctor at Walter Reed that actually saw him as a patient and took him off that one drug because of the liver enzyme issue? We're certainly not discounting it, Your Honor. That is undisputed in the record that one doctor thought that was the cause and took the defendant off the drug for that reason. But again, he was on two drugs. He was on polypharmacy. The other one is much more known to cause elevated liver enzymes and with a careful monitoring... Did he continue, and I do not know this part of the record, did he continue on the other drug at Walter Reed? So you said he was on two, they took him off of one, did he stay on the other one or did they take him off of both of them? If you know, I'm not trying to get you to speculate. I know he eventually did, Your Honor. He was discharged fairly quickly to return to his naval service, but I don't know the answer of which one was stopped first. And in essence, given the record we've got now, all we know is the expert doctor's opinions based on their review of the actual records on that issue. That's right, Your Honor. All that was in the district court record was, I believe, Dr. Gatti's summary of the naval records, but there was agreement between the experts that it is not entirely clear. Both that one internal medicine specialist did recommend stopping for that reason, but also that other staff thought it was unclear which one caused it. So in other words, both the government and the defendant's expert, in reviewing the records that we don't have before us, said there's ambiguity about which of these drugs was causing the liver enzymes to go up. Yes, Your Honor. Can you talk about the main point we talked with your colleague about the Harper treatment and maybe begin with the question that I had for him, which is, if we vacated the cell order, what is the basis for his continued detention by the Attorney General to administer drugs under Harper if we vacated it? Your Honor, if this court vacated and remanded with instructions for the district court to consider the ongoing, if it were to be ongoing, but to consider the revised treatment under Harper, I believe this government could petition the court for a new 4241D2 order on the substantial probability question. This court has already issued an extensive opinion on substantial probability and found it to be a lower threshold than the substantial likelihood question under cell. Although I do want to emphasize that the government does not think there should be a remand, but that the defendant is not in an identical drug regime. As far as we know, he is currently receiving 10 milligrams of olanzapine, but the cell appendix authorizes a range all the way up. So the government doesn't recommend that there be a remand because your first position is that we should affirm the district court, correct? Yes, Your Honor, and also because... But if we don't, if we are looking at this and trying to decide between vacating the cell order, given the intervening Harper drug regime that's occurring now, does the government have a preference one way or the other as to that? Yes, Your Honor, the government would favor a remand if, as I believe Judge Richardson was mentioning previously, if, for instance, there is no issue with the liver enzymes or So help me understand, I get that point, help me understand why the government takes the position that we can just affirm without sending it back for the district court to consider what happens. I mean, I get it's not the exact same story, right, but it's really like quite similar. And if what we're really concerned about, to take two of your colleagues' example, is too much drowsiness and raising liver enzymes, why wouldn't the government want the district court to go back and look and say, okay, we now have a month worth of information, government, give me an update on how much is he sleeping? What is his liver enzyme testing doing? What impact is this having on his mental health? I mean, why wouldn't we want, before we take the drastic step of ordering a cell medication regime, for the district court to consider this new information? I can't get my head around that. Your Honor, I'd first point the court to the Third Circuit's decision in United States v. Grape, which is 549F3R591, which reached a different conclusion than the court in Osborn. I have a question, Ms. Gant. The case that you just cited, did you provide that to opposing counsel before argument this morning? I did not, Your Honor. Okay. Could you do a follow-up 28J letter on that then? Yes, Your Honor. In that case, the defendant reached, was treated under Harper while the cell appeal was pending and actually became competent. But the court proceeded to address the cell order and said it was appropriate to do so because the defendant had an ongoing mental illness. And if he were to become incompetent again, the government could seek to use the cell order again. But in Grape, was the Harper regime so close, I get not identical, but so close to the cell regime that was being ordered such that the Harper regime and his reaction to it would provide really valuable information about the concerns that we might have with the cell regime? Was that true in the Third Circuit? I haven't read that case either. I don't believe those facts were discussed by the Third Circuit either way. But we know here that the Dr. Grady acts conservatively and it could very well be that if the defendant became stable on Olanzapine, given how long he was stable on Haldol, the Dr. Grady would remove the Olanzapine just like he reduced the defendant's Haldol medication at the defendant's request. While I would note competency proceedings were going on before the district court. And so then we would be back in square one. And it would prolong these proceedings undoubtedly to remand to consider any additional medication that might occur. And prolonging the forcible medication of the defendant is contrary to both the government's in a speedy resolution of the case that was recognized in cell and to the defendant's interest to remain on forcible medication. Is there any question that the success or lack thereof of the regimen under the Harper order will be informative to the decision making process for the cell order? Is there any question that it will be informative? It could be, Your Honor. I would agree with Your Honor that it is likely to be informative. But since we don't know how it will be informative, how it will be changed, we could very easily be back in the position where the defendant is no longer gravely disabled but still incompetent. And then we would have to address cell again and it would further prolong these proceedings. But it seems to me that the district court would appreciate the additional information when making a decision on the cell order. I understand, Your Honor. And there would certainly be a mechanism for this court to manage anything substantial that occurred if this court retained jurisdiction. And that's under Federal Rule of Appellate Procedure 12.1, which allows an indicative ruling by the district court. So first, the district court would retain jurisdiction under Harper, as it did under the stay order. And under 12.1, if anything substantial were to happen with respect to cell, either party could make a motion. The district court could indicate that it would make an indicative ruling. And this court could remand the case back if it thought appropriate. And in the government's view, that would be the most efficient way to move these proceedings forward. If I could return to the, unless the court has further questions on the remand, but the defendant's diagnosis is one that is generally responsive to antipsychotics, that this defendant has responded well to antipsychotics in the past, including the very two medications in the treatment plan, and including polypharmacy, which the defendant received while he was in the Navy. They agreed that the defendant... Has he ever been restored to competency under these two medications?  When he was solely on Haldol, the BOP entered a certificate of competency. There was about a four-month period, I believe, while he was evaluated by the defense's experts. And also during that period, that was when Dr. Grady reduced his Haldol medication at the defendant's request. And shortly after that, he had his idiosyncratic relapse, and the BOP withdrew the certificate of competency. So there was no final adjudication of whether he received, of whether he became competent on Haldol. As to his time in the Navy, competency certainly wasn't an issue there, but we do know that he was discharged back to active duty with a security clearance, and served an additional 10 years in the Navy before retiring. Turning first to PRONG-2, which is, and the competence aspect of that, contrary to the suggestions in the defendant's brief, polypharmacy is not some radical or novel medication. The very study that Dr. Corbin relied on by Jackson, termed it a fairly common prescribing  And most importantly, under this court's precedence, we know that it has been effective for the most important population at issue here, which is this defendant. The defendant's expert... I'm sorry. Yep, sorry. You mentioned the conservative nature of the treating doctor, and I think you mentioned in the context of whether the elazapine would be discontinued under Harper if the worsening conditions improve, such that he's no longer a danger. Help me understand why we should think that's a real possibility, and is there any information that you can give us that suggests that that is or is not a realistic possibility under Harper? Well, first, Your Honor, we know the practice of Dr. Grady, which is once the defendant was, he believes, stable enough and opine competent, he did reduce his antipsychotic medication, showing that he is just trying to keep him non-dangerous or non-greatly disabled. We also know that for this defendant, at least the records suggest that his mental illness seems to come and go, given that he served so many years in the Navy following the first psychotic episode that we know about, and he was stable for a year and a half on Hildahl. So it's unclear what's led to this recent deterioration, but it seems a likely possibility that under Dr. Grady, he is either non-dangerous or non-greatly disabled, that the BOP would consider returning him to the Hildahl that had been successful for so long at keeping him within Harper. The defendants, going back to Dr. Corbin's, what Dr. Corbin asked the court to accept, his 30% figure lacks a credible foundation and shows that the defendants expert was not the one who tailored his recommendations and analysis to this individual defendant. This 30% number was taken from a study in Indiana of defendants receiving very different treatment from this defendant, and was based on restoration rate after two years, which was more time than had even elapsed by the time of the cell hearing. The BOP requested cell at only the year mark. Far more telling from that study is the statistic that two-thirds of defendants who had not been restored after six months were restored. I read the charts from the defendants. But this defendant has been taking Hildahl for over 18 months now without being restored to competency, so how can he be compared to the general population in that Cochran study that were restored to competency in 120 days? Yes, Your Honor, because the record clearly shows that this is an inadequate dose for him specifically. First, it is less than half of the Hildahl dose that Dr. Corbin acknowledged could be a reasonable dose. Second, when his medication was reduced only slightly, he had a dramatic and idiosyncratic relapse. And as the district court noted in its opinion, his blood level testing shortly after that incident showed that he had much lower blood levels than you might expect. And I guess that takes us back to the fact that on the current level of Hildahl alone, he's sleeping 16 hours a day, and like Judge Richardson, I'm not a doctor, but it sort of stands to reason that if you increase that dose and add something else to it, that the sedation would increase. How does sleeping more than 16 hours a day assist in, make him able to assist in his defense such that he would be confident? Yes, Your Honor. First, I want to clarify based on the reply. The government certainly does not concede that it's unrebutted that his sedation would not get worse than 16 hours a day. First, Dr. Grady testified that because he is already sedated, he did not think additional sedation would be a problem. Dr. Grady also testified that he would, in the short-term phase of the lansipine, he would give it only at night, mitigating the effects of sedation, and would only transition to a long-acting dose if he thought it was appropriate based on the side effects. So that effectively precludes sedation from worsening. Further, I would point that 16 hours is solely based on the defendant's own self-report to Dr. Corvin, and Dr. Corvin did not report in his interviews having any difficulty interacting with the defendant because of sedation. Indeed, his pre-hearing cell report did not even mention sedation at all. Your Honor, I see that my time has elapsed. If there are no further questions, we would ask that you affirm the decision below. Thank you, Ms. Gantt. Mr. Grinrod? I think your mic is off. Thank you, Judge Thacker. Okay, so start again. Thank you. If I could just pick up with a couple of points that my friend on the other side left off on. My friend on the other side mentioned this notion of the levels of the drug in Mr. Brown's blood, but if you read, I encourage your Honors to read what Dr. Grady actually said about that, because this is what Dr. Grady said at page 375 of the Joint Appendix. There is no evidence that directly correlates the drug to someone's response to the medication. Dr. Grady pointed out the acknowledge that there's just no evidence that correlates someone's response to the drug to the level in the blood. The second point that my colleague, or my friend on the other side made was this notion of I understand the record. He was treated for this 18-month period, but you agree there was a period of time in the middle there where at least the BOP doctors found him to have been restored to competency, and then while your doctors were looking at him, he had this idiosyncratic relapse, for lack of a better phrase, that sort of occurred in the middle. Tell me, if that's factually accurate, why we ought not to think that's suggestive on the substantially likely prong that he's going to respond to medications of some sort. Your Honor, I don't think that's entirely factually accurate. The reduction in dose was for about a week. I think it was eight days. Dr. Grady acknowledged at the cell hearing that although the government said that he was competent and opined on that point and submitted a certificate, in retrospect, they realized he was never competent. It's not that he was competent and then fell out of competence. He was hiding his delusions from the BOP doctors because they had been incorporated into the delusions. They were part of the government conspiracy in Mr. Brown's mind. When our doctors interviewed Mr. Brown and turned over the reports to the BOP doctors, the BOP doctors confronted Mr. Brown explicitly about the delusions he had been previously hiding from them. That was what led them to withdraw the certificate of competency. We dispute the notion that there was an idiosyncratic response to the reduction in dose rather than simply... This realization by the Bureau of Prisons was within days of when we turned over our expert reports, and their doctors went back and re-interviewed Mr. Brown. That's in the record. I acknowledge that Dr. Grady testified that this was an idiosyncratic response, but we dispute that point. Your Honors... But that's sort of what the district court does, right? The district court sort of considered that and seemed to take a little bit of a different view than you take, and you're certainly entitled to that. But our review is mostly sort of deferential to the district court on that, no? I think on that specific point, yes, Your Honor. I don't think we're making an argument that that particular kind of sub-factual finding was clearly erroneous. With respect to another point my colleague on the other side made was with respect to the 16 hours a day figure, I just want to point out, as Your Honor noted, Judge Richardson, that that was a factual finding the judge actually made, that Mr. Brown is sleeping 16 hours a day. So the government is saying, well, this is based on self-reports, but just like the clearly erroneous standard is entitled to deference when the facts are bad for us, that particular factual finding is also subject to clearly erroneous review. But then in the second fact-finding that's relevant there is he's sleeping 16 hours a day, but at least according to the district court, it doesn't appear that this polypharmy is going to necessarily affect that negatively. I agree that the court found that, Your Honor. That finding was clearly erroneous, and the reason why is sort of twofold. Just to make sure, I want to get to the reason why, but that is also the same standard, but your view is that the district court just could not have found that. Even though it's a factual finding, we review it with great deference, you think it's just that far wrong. So tell me why. Yes, Your Honor. Well, so the district court said that Dr. Grady testified that the sedation would get no worse under this proposed plan. Dr. Grady didn't testify to that, and we go through this in detail on page 50 of our opening brief with all the record sites and our kind of best guess as to how the district court misread the record. Basically, there was another drug that was the subject of discussion, and the doctors started using the brand names instead of the generic names. It's understandable how the district court got that wrong, but there's simply no testimony in the record by Dr. Grady that the sedation is not likely to worsen on this plan. On the other hand, Dr. Corbin testified unrebutted that the sedation is likely to worsen, and both doctors testified in the district court found that the sedation is already quite bad 16 hours a day. So on this record, there's simply no basis to find that the sedation will not likely worsen, and I think when you apply those facts to the law, if you have worsening sedation for somebody who's already sleeping 16 hours a day, we are to the point where it's going to interfere with his ability to have a fair trial, and so that's our position on that, Your Honor. The other thing I would just close with, Your Honors, is if the court does decide to remand, we would ask the court to at least consider weighing in on some of the legal standards, specifically with respect to prong two as to both sedation and whether the district court's job is to find the best plan or a plan that's actually likely to succeed. So we ask the court to vacate the order. Thank you, Your Honors. All right, thank you, and we thank both counsel Ms. Gant and Mr. Grinrod for your arguments today and your very able representation on behalf of your clients. We appreciate you from a distance, and now the court will be in recess until our next argument. Thank you.
judges: Stephanie D. Thacker, Julius N. Richardson, Kenneth D. Bell